STATE OF MAINE
OXFORD, ss.

RECEIVED AND FILED

JUL 25 2000

Donna L. Howe
CLERK OF COURTS

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-99-02

AP 98-10

WILLIAM & BARBARA CHARLTON,

Plaintiffs,

v.

RODNEY SMITH in his capacity as
Code Enforcement Officer for the Town of Oxford,
INHABITANTS OF THE TOWN OF OXFORD,
OXFORD PLANNING BOARD,
and CARL M. DELEKTO,

Defendants

ORDER

EAG-OXF-7/25/2000

PROCEDURAL HISTORY

On October 13, 1998, William and Barbara Charlton (Charltons) filed suit against Carl M. Delekto, the Town of Oxford, the Oxford Planning Board (Planning Board), and Rodney Smith, Code Enforcement Officer for the Town of Oxford (CEO). In their complaint, the plaintiffs asserted that the court had jurisdiction pursuant to M.R. Civ. P. 80B (a), 30-A M.R.S.A. § 2691(3)(G), 4 M.R.S.A. § 105, and 14 M.R.S.A. § 5953. Count I requested a review of the actions taken by the Zoning Board of Appeals for the Town of Oxford (ZBA). Count II alleged that Mr. Delekto's house was a nuisance. Count III requested that the court determine that the Planning Board had acted beyond its legal authority in granting Mr. Delekto his permit, and that an order that the structure and the site be brought into compliance with all applicable land use statutes and ordinances be issued. Count IV requested that the court determine that Mr. Delekto was in violation of his permit and in violation of State and municipal statutes and ordinances, and issue an order that he

be required to take all actions necessary to bring the structure and the site into compliance with all applicable land use statutes and ordinances.

The first amended complaint was filed on November 2, 1998. That complaint added Count V, a claim of negligence against Mr. Delekto. The second amended complaint, filed on January 19, 1999, became the operative complaint. Count I still contained the Rule 80B appeal. Count II alleged that Mr. Delekto had caused a nuisance pursuant to 30-A M.R.S.A. § 4302 and requested injunctive relief. Count III requested a declaratory judgment against the Planning Board and Mr. Delekto. Count IV requested a declaratory judgment against Mr. Delekto. Count V alleged negligence against Mr. Delekto. Count VI demanded damages from Mr. Delekto for nuisance, pursuant to 30-A M.R.S.A. § 4302 and common law.

Over the course of the next eighteen months, the parties completed discovery and submitted various motions for decision. These included a Motion to Dismiss Count V, and a Motion for Summary Judgment both brought by Mr. Delekto. He prevailed only on the motion to dismiss Count V. In addition, the court denied the plaintiffs' M.R. Civ. P. 80B appeal in November of 1999.

The case was tried on May 15, 16, and 17, 2000. Before any testimony was taken, the parties, their attorneys, and the court took a view of both properties. In addition to the information gathered during that view, the court has considered the testimony of the various witnesses presented at trial, as well as the documents, photographs, maps, and drawings placed into evidence. The Planning Board made an oral Motion to Dismiss Count III on the first morning of trial. Mr. Delekto made

2

a Motion for Judgment as a Matter of Law at the close of the plaintiffs' case. The court took both motions under advisement.

FINDINGS OF FACT

In 1982, the Charltons purchased a cottage on Thompson Lake in the town of Oxford. At the time of purchase, the property was significantly rundown, and was known as the neighborhood's "haunted house." However, the plaintiffs looked past the condition of the house and saw the privacy created by the surrounding woods, and the safety presented by a private cove. In order to enjoy their purchase, plaintiffs undertook significant improvements both to the site and to the house. Between 1982 and 1998, they replaced windows, updated the electrical system, installed a new foundation, finished the interior, installed water and septic systems, and built a driveway that included drainage culverts. During those sixteen years, the plaintiffs, their children, grandchildren, and guests used the property throughout each late spring, summer, and early fall. In 1997, the Charltons placed the property into a trust for their children and grandchildren.

Mr. Delekto purchased the abutting parcel of lake front property in 1994. At the time of purchase, a small camp was located at the water's edge on the side of the property away from the Charlton camp. As a result, the two cottages were not generally visible to each other. Between 1994 and 1997, the plaintiffs and Mr. Delekto lived side-by-side without dispute, and almost without contact. During the summer of 1997, Mr. Delekto asked Mr. Charlton for permission to go onto their land to take some measurements because he was "seeing what he could do with [his]

3

land." Mr. Charlton granted him permission, and the two men then had a very brief and general conversation about some birch trees that were overhanging the Charlton property, and some occasional water run off from across Mr. Delekto's property.

On August 28, 1997, Mr. Delekto submitted a Shoreland Zoning Application to the Town. On the same day, the Planning Board approved that application. A building permit based upon the approved application was issued on October 1, 1997. Sometime after that date, Mr. Delekto began constructing a year-round home on his land. During the late fall of 1997, he cleared a construction site, built a large drainage ditch directly next to his boundary with the Charltons, used a portion of the ditch as a retaining wall, and poured foundations for a house, a breezeway, and an attached garage.

The Charltons had returned to Massachusetts for the winter in mid-September of 1997, so they were completely unaware of any of Mr. Delekto's actions. In February of 1998, the Charltons returned to Maine to see if their property had sustained any damage from an ice storm that had occurred one month earlier. For the first time, they saw the work Mr. Delekto had done, and were alarmed by its scope. They spoke with Mr. Smith, Oxford's CEO, told him of their concerns over the number of trees cut, and asked him to look into it. He agreed that he would investigate and get back to them. He did not, and the Charltons did not immediately follow up on their inquiry.

4

The Charltons returned to Maine two months later, and again spoke to Mr. Smith about the project. Again he promised to investigate and get back to them, and again he did not.

In June of 1998, tiring of the lack of response from Mr. Smith, the Charltons contacted Maine's Department of Environmental Protection (DEP). During that conversation, the Charltons learned, for the first time, that in order to build his house, Mr. Delekto must have received a permit from the Town, that the Town was required to have an ordinance controlling shoreline use, and that the terms of the permit had to comply with the Town's ordinance. Armed with that information, the Charltons went to the Town office and obtained copies of Mr. Delekto's application, the permit granted to him, and the Oxford Zoning Ordinance (Ordinance). Based upon their review of these documents, the Charltons believed that the Planning Board had not complied with the Ordinance.

On August 5, 1998, the Charltons filed an appeal with the ZBA, challenging the permit granted to Delekto nearly one year earlier. A hearing on the appeal was scheduled for August 27, 1998. On the same date, the ZBA determined that the Charltons' appeal was untimely, and dismissed it. In doing so, the ZBA determined that there was not good cause to extend the thirty-day appeal period. Ordinance § 19(G)(4)(a)(1).

As noted above, the Charltons appealed the ZBA's decision to the Superior Court in their complaint filed October 13, 1998. No objection was made concerning

5

the timeliness of that appeal. A hearing was held on August 6, 1999, and Justice Perkins upheld the decision of the ZBA in a decision dated November 8, 1999.

Based upon the evidence presented, the court finds that there were many irregularities in the process that resulted in Mr. Delekto's building permit. Those irregularities include the following:

1.   The Town of Oxford requires that agents representing principals before its Planning Board provide the Board with written authorization. Ordinance § 19(B)(3). On August 28, 1997, Tom Kennison filed a request for a permit to build a two-story house with full basement and a garage on a slab on Mr. Delekto's lake front property. Mr. Kennison did not have a letter of authorization from Mr. Delekto.

2.   The Town also requires the filing of a map with all Shoreland Zoning Applications. Shoreland Zoning Application. The map must include various information including lot dimensions, exact location and dimensions of proposed buildings or structures, dimensions of area to be cleared, distance from shoreline to proposed structure, and dimensions of existing and proposed buildings. This information is required because of the various limitations on size and placement imposed within the Shoreline Zone. Mr. Delekto's application did not include all the information required by the Town.

It is the responsibility of the Code Enforcement Agent to notify an applicant if the application is incomplete. Ordinance, § 19(C)(1). Mr. Smith never notified Mr. Delekto of the flaws in his application.

3.   If Mr. Delekto had purchased an unimproved lot, and had then requested permission to build a new home, the structure would have had to be set back at least one hundred (100) feet from the normal high-water line the lake. Ordinance § 15(B)(1)(a). However, because Mr. Delekto's existing camp was a nonconforming use, another provision of the Ordinance came into play. Since January of 1989, nonconforming uses within the Town's Shoreline Zone[1] could be expanded, but only with the approval of the

---

[1]The Ordinance defines the Shoreline Zone as the land within 250 feet, horizontal distance, of the normal high water line of any great pond or river. Thompson Lake is a great pond, and both the Delekto buildings and the Charltons' building are within the Shoreline Zone.

Planning Board. The Planning Board was authorized to approve expansions that did not increase the floor area or volume of the existing structure by more than 30%. Ordinance § 12(C)(1)(d)(1). The application filed on Mr. Delekto's behalf indicated that 704 square feet of the existing building were within the Shoreland Zone.[2] Therefore, the floor area of the proposed expansion within the Shoreline Zone could not exceed 915.2 square feet. Mr. Delekto's application indicated that only 492 square feet of the new building would be within the Shoreline Zone, but there are no volume measurements for either the existing or the proposed buildings. Without that information, the Planning Board was not authorized to approve the permit, as it could not determine whether the proposed building exceeded the 30% rule.

4.     Because the relocation of a nonconforming use was contemplated, the Planning Board could authorize a building permit as long as the request conformed to "all setback requirements to the greatest possible extent determined by the Planning Board . . . ." Ordinance § 12(C)(2). In other words, unless the lot makes such placement impossible, the Ordinance requires that all replacement buildings be built at least 100 feet from the high water mark.

According to Richard Baker, Shoreline Zoning Coordinator for the DEP, Mr. Delekto could have built a structure falling within the 30% rule more than 100 feet back from the high water mark. Despite that, the Planning Board did not require him to comply with the set back requirements. The Planning Board granted permission for Mr. Delekto to build as close as 90 feet from the lake.

5.     Once an application has been submitted, the Planning Board generally has 35 days to approve, approve with conditions, or deny it. However, before the Board was authorized to make a decision on any application, it was required to notify property owners within 500 feet, the fire chief, the police chief, the Town manager, and the Oxford Water District. Ordinance § 19(C)(2)(c). No notice was given to the Charltons or to any other property

---

[2]Mr. Smith testified at trial that he believed the requirements were to be applied separately. That is, as long as the new building was either less than 30% bigger in volume or 30% bigger in floor area, it would be compliant with the Ordinance. Such an interpretation does not fit the language of the Ordinance and, even more simply, does not make sense. The enforcement method supported by Mr. Smith would permit the building of skyscrapers along the lake, so long as their floor areas did not exceed the floor areas of existing camps by more than 30%. Plaintiff's exhibit 18.

owners within 500 feet before the Board made its decision on Mr. Delekto's application.

Leaving aside the problems associated with the permit approval process, the existing structure violates the permit granted by the Planning Board in several ways:

1.    As discussed above, the Ordinance mandates that a "replacement" structure within the Shoreline Zone cannot be more that 30% larger than the footprint or the volume of the nonconforming, existing building. Measurements taken by Richard Baker demonstrate that the shoreline floor area of the existing building was 632 square feet. Therefore, the shoreline floor area of the new building could only be 822 square feet under the Ordinance. According to Richard Baker, this building exceeds that by more than 1000 cubic feet. Mr. Baker also measured the volume of the existing building at 5412 cubic feet. Again based upon the Ordinance's 30% rule, the new building could be no larger than 7036 cubic feet. Plaintiff's exhibit 18.

2.    The permit allowed Mr. Delekto to construct a 28' x 44', two-story house with a full foundation, a 28' x 40' garage on a slab, a 12' x 16' deck, and a 12' x 16' breezeway between the garage and the house. The breezeway exceeds the measurements allowed by the permit.

3.    The permit required that the house be set back a minimum of ninety feet from the high water mark. Parts of the structure are approximately eighty-six feet from the high water mark.

4.    The permit allows the structure to be no higher than 24 feet. It is 32 feet high at the garage. The height of the house is unknown, but any measurements taken on the non-water side of the house must be increased by 3.5 feet to accommodate the fill Mr. Delekto added to the land. Ordinance definition of "height of a structure," p. 72.

5.    There are more than 492 square feet within 90 feet of the high water mark.

6.    More than 492 square feet of the structure are within 100 feet of the high water mark.

Mr. Delekto acknowledged all of these violations, but asserted that they were all done unknowingly.

In addition to the acknowledged violations above, there are other problems with the site:

1.     The garage and the breezeway both have full foundations. The permit does not provide for a full foundation for any structure except the "house." The basement under the garage is currently being used to store building materials, snowmobiles, and water craft. The basement under the breezeway will be used as living space.

2.     Mr. Delekto built a drainage ditch that also serves as a retaining wall immediately next to the boundary between his land and the Charltons' land. The ditch/retaining wall is a structure pursuant to the definition contained within the Ordinance:

> [A]nything built for the support, shelter or enclosure of persons, animals, goods or property of any kind, together with anything constructed or erected with a fixed location on or in the ground, exclusive of fences streets and sidewalks. The term includes structures temporarily or permanently located, such as decks and satellite dishes.

Ordinance, p. 76.     The permit requires that there be a minimum of twenty-five feet between any structure and the boundary line.

3.     As noted above, the permit granted to Mr. Delekto did not grant permission for the construction of this ditch. In addition, Mr. Delekto did not obtain a permit from the DEP as required by 38 M.R.S.A. § 480-C.

4.     The Ordinance allows for some clearing of trees and brush to allow for construction, but no greater than 10,000 square feet.  Ordinance § 17(I)(3) Before constructing his home, Delekto cleared a quadrangle measuring 100' x 85' x 167' x 118'.  Plaintiff exhibit 18.

5.     The permit allowed for a two-story houseand a garage on a slab.  The house site slopes down to the water.  Rather than remove earth at the road side to create a level area, Mr. Delekto built up that side, and constructed a basement under the house, the breezeway and the garage so that it is entirely above grade on the water side. As a result, the house and the garage rise three stories above the ground at the water side.

6.     During the trial, Mr. Delekto installed a 4' x 5' concrete slab next to the garage to allow for the installation of a generator.  He was unable to state

9

whether the slab was closer than twenty-five feet to the boundary line, and asserted that he did not believe he needed a permit to install the slab.

7.      The Ordinance states that terms not defined therein "shall have the customary dictionary meaning." Ordinance, § 20(A)(2).   The common dictionary meaning of "breezeway" is  a roofed open-sided passageway connecting two buildings. Oxford American Dictionary 1980. The breezeway constructed by Mr. Delekto is entirely enclosed, has a full basement, and houses the main kitchen, laundry, and a full bath.

Rodney Smith testified that, if a landowner violated a permit granted by the Planning Board, he had three options:  he could issue a stop work order; he could revoke the permit; or he could prosecute the violator in court, with the permission of the selectmen.  Although he did not mention it, Mr. Smith must have a fourth option, as he decided in this case to take no action.  He testified that he has seen no "substantial deviation" from Mr. Delekto's permit, and that he intends to grant the certificate of occupancy as soon as the old camp has been demolished.

## CONCLUSIONS OF LAW

1. Planning Board's Motion to Dismiss

In support of its motion to dismiss, the Planning Board cited *Colby v. York County Commissioners*, 442 A.2d 544 (Me. 1982).   In that case, the Law Court dismissed the plaintiff's complaint challenging his dismissal as a Deputy Sheriff. The basis for the Court's decision was the determination that both counts were untimely under M.R. Civ. P. 80B(b):  "The time within which review may be sought shall be as provided by statute, except that if no time limit is specified by statute, the complaint shall be filed within 30 days after notice of any action or refusal to act of

10

which review is sought." As noted above, the Charltons filed this action on October 13, 1998. The final decision by the ZBA was issued on August 27, 1998.

Plaintiffs have cited *Mercier v. Town of Fairfield*, 628 A.2d 1053 (Me. 1993), and *Maine Turnpike Authority v. Brennan*, 342 A.2d 719 (Me. 1975) to support their contention that the 30-day limit does not apply, because they have separate and independent bases for their claims against the Planning Board. In *Mercier*, a former town manager filed suit alleging a violation of the town charter, a breach of contract, and a denial of due process arising from the town's failure to reappoint him. At trial, he prevailed, and the town appealed. In its decision, the Law Court noted that:

> That the court has jurisdiction to entertain a claim for review of government action pursuant to Rule 80B does not prevent the filing of independent civil claims otherwise available. Mercier's case was filed and proceeded in accordance with the pretrial procedure outlined in M.R. Civ. P. 16. The Town did not raise its procedural dispute until nine months into the litigation, well after both parties had actively participated in pretrial scheduling and discovery. Although Mercier may have been able to seek review of the termination proceedings pursuant to Rule 80B, given the procedural purpose of Rule 80B and its intended flexibility, it was not error in these circumstances to treat the entire cause of action as a traditional civil action.

*Mercier*, 628 A.2d at 1057.

The Planning Board made its motion to dismiss orally before the start of trial on May 15, 2000. After review of the evidence presented and the cases cited, the court grants the Planning Board's motion to dismiss. The 30-day limitation applies to Rule 80B appeals and to those claims that can be raised in that type of action. In their appeal to the ZBA, the plaintiffs have alleged that the Planning Board improperly granted the permit to Mr. Delekto despite his failure to provide all of the

11

information required. They also complained that the Planning Board improperly granted the request without notifying them or the other owners of abutting property.

When Justice Perkins upheld the ZBA's refusal to hear the merits of plaintiffs' appeal, his decision ended the Charltons' opportunity to proceed with those complaints. The plaintiffs' argument that the Planning Board's actions in granting a building permit to Mr. Delekto were *ultra vires* and, therefore, gave rise to a separate cause of action are not persuasive. Those actions alleged to be outside the authority of the Planning Board and not reasonably related to the objectives of the Ordinance, *i.e.*, the granting of a permit without notice, and the granting of a permit based upon insufficient information, and the granting of a permit to build only 90 feet back from the high water mark are the same actions raised by the Charltons in their appeal. If that appeal had been timely, all those decisions by the Planning Board would have been considered by the ZBA and, if necessary, by the Superior Court. Pursuant to M.R. Civ. P. 80B(d), any party to an administrative appeal process may request a "trial of the facts." If the ZBA had considered the appeal timely, but denied the appeal for other reasons, the parties could have presented all of the evidence submitted here, in addition to that contained in the administrative record.

Based upon the findings and conclusions above, the Planning Board's motion to dismiss is granted.

12

2. Mr. Delekto's Motion for Judgment as a Matter of Law

Mr. Delekto argued that, even if all facts asserted by the plaintiffs are accepted as true, the plaintiffs do not have a right of action against him for creating or maintaining a nuisance. Plaintiffs responded that, under 30-A M.R.S.A. § 4302, Mr. Delekto's property is a nuisance because it is in violation of the Town's Ordinance and/or state statutes.

There is no private nuisance in this case. Title 17 M.R.S.A. § 2701 permits private actions for damages caused by the nuisances listed in sections 2791 through 2805: "Any person injured in his comfort, property or the enjoyment of his estate by a common and public or private nuisance may maintain against the offender a civil action for his damages, unless otherwise specially provided." None of the nuisances enumerated can be interpreted to include the actions taken by Mr. Delekto or the effect his actions have had on the Charltons. In addition, the Charltons have chosen to forgo damages and have requested injunctive relief, so they argue that their claim does not fall within the limitations of 17 M.R.S.A. § 2701, *et seq.*

The Charltons assert that there is a common law right of nuisance, based upon the holdings in *Hamlin Group v. Intern. Minerals & Chemical Corp.*, 759 F. Supp. 925 (D. Me. 1990) and *Saco Steel Co. v. Saco Defense, Inc.*, 910 F. Supp. 803 (D. Me. 1995). In *Saco Steel*, a provider of scrap metal removal and processing services filed suit against a weapons' manufacturer, alleging that the materials bought from the defendant had contaminated the plaintiff's property. The court

13

dismissed the nuisance portion of that suit, but noted that Maine law recognized "the tort of private nuisance." *Id* p. 812. The court in *Hamlin Group* noted that: "Maine law has recognized a cause of action for a continuing private nuisance. Such an action will lie where the defendant's use of its land causes a continuing injury to the adjoining or neighboring land." *Hamlin Group* at 935. The plaintiffs argue that, this language, when reviewed with the footnote referring to actions for damages also provided for by statute, demonstrates that there is a common law right of nuisance independent of 17 M.R.S.A. § 2701.

The alleged nuisance is based upon the assertion that Mr. Delekto has violated land use statutes and local ordinances and that, pursuant to 30-A M.R.S.A. § 4302, his structures are a nuisance. Given the purpose for which land use ordinances are enacted and enforced, a nuisance arising from the violation of a zoning or land use ordinance must be considered a "public" nuisance. A public nuisance is one that does not necessarily interfere with another's use or enjoyment of his land. Rather, it includes any unreasonable interference with a right common to the general public. 58 Am. Jur. 2d § 33.

State law requires municipalities to adopt zoning and land use control ordinances that meet minimum guidelines set by the Board of Environmental Protection for the protection and preservation of shoreland areas. 38 M.R.S.A. §§ 435 & 438-A. In 1994, the town of Oxford met that requirement when it adopted the Ordinance mentioned above. The Ordinance, itself, is a well-crafted attempt to:

> [P]romote the health, safety and general welfare of the people; to
> further the maintenance of safe and healthful conditions; to encourage

14

the most appropriate use of the land throughout the Town; to protect the environment; to provide for the orderly development of a sound and stable community; to conserve natural resources; to provide for safe and adequate public services; to prevent and control water pollution; to protect fish spawning grounds, aquatic life bird and other wildlife habitat; to protect buildings and lands from flooding and accelerated erosion; to protect archaeological and historic resources; to protect freshwater and wetlands; to control building sites, placement of structures and land uses; to conserve shore cover, and visual as well as actual points of access to inland waters; to conserve natural beauty and open space; and to anticipate and respond to the impacts of development.

Ordinance § 1. However, all of the persons charged with the interpretation and enforcement of this grand scheme, with the exception of the CEO, are volunteers. The members of the Planning Board and the members of the ZBA are elected or appointed public servants who are not paid for their services. It must be expected that, despite their best intentions, these public servants will make errors in the interpretation or application of the Ordinance. Given the expense involved, it can be no surprise that, when errors occur, the parties involved will try to correct the problem without resort to litigation. Both the DEP and the Town have directed Mr. Delekto to take actions intended to limit the damage caused by his actions. The testimony presented at trial supported Mr. Delekto's testimony that he has, since the problems were discovered, done everything asked of him. Unfortunately, the damage has already been done.

It is also easy to understand why the Charltons and other area residents are frustrated by the action—or inaction—of the Town and the DEP. Selective enforcement of ordinances and statutes will inevitably lead to future attempts to see just how much noncompliance will be tolerated. If the Town and the State hope to

15

meet the lofty goals set out in the Ordinance, both may wish to reconsider their methodologies.

Having reviewed all of the cases cited by both the plaintiffs and Mr. Delekto, the court holds that 30-A M.R.S.A. § 4302 does not provide a private cause of action to prosecute zoning or land use violations. As a general rule, public problems are not abated by individuals, but rather by public officers, usually with the assistance of an attorney general. While zoning or nuisance statutes from other states include provisions allowing for private taxpayers to bring suit, Maine's statutory scheme contains no similar provision. *See,e.g.*, New York's McKinney's Town Law § 268(2); Neb. Rev. Stat. § 23-114.05; Illinois Municipal Code § 11-13-15.

Maine's Legislature has, at least in one other area, considered the necessity for private actions in the face of an agency's refusal to act, and provided concerned citizens with standing. *See, e.g.*, 22 M.R.S.A. § 4032(1)(C). The court is compelled to determine that the lack of such a citizen action provision in the zoning and land use statutes demonstrates a legislative intent that such actions not be allowed. Persons dissatisfied with a municipality's decision not to regulate compliance with its ordinance or building permits can appeal the decisions through timely administrative and court actions, and may also "assist" consistent compliance through the political process.[3]

---

[3]Section 19(G)(4)(a)(1) of the Ordinance allows the Charltons to appeal every decision made by the CEO concerning Mr. Delekto's property.

16

For the reasons stated above, Mr. Delekto's motion for judgment as a matter of law is granted.

Even if there were a cause of action available to them, the Charltons would have to establish that, as a result of Mr. Delekto's violations, they have suffered special damage. *Smedberg v. Moxie Dam Co.*, 148 Me. 302, 92 A.2d 606 (Me. 1952); *Kennebunk, Kennebunkport and Wells Water Dist. v. Maine Turnpike Authority*, 145 Me. 35, 71 A.2d 520 (Me. 1950). The "special and peculiar" damages claimed by the Charltons must be over and above those damages suffered by the public. *Penley v. City of Auburn*, 85 Me. 278, 27 A. 158 (1893).

In order to determine whether the Charltons have suffered special damages, it is necessary to determine with some precision the "nature" of nuisance caused by the violations. There is more of Mr. Delekto's house inside the shoreland zone that the Ordinance permits. The house with its attached garage is not 100 feet back from the high water mark, as required by the Ordinance. Soil, sand, vegetation, and other materials were removed and displaced, and fill was added to the area adjacent to Thompson Lake without a permit, all in violation of 38 M.R.S.A. § 480-C and 38 M.R.S.A. § 413(1). Trees were removed and soils were disrupted in violation of Ordinance § 17(I) and (J). Soil was discharged into the lake without a license from DEP. All of these violations have damaged an already fragile ecosystem and, therefore, the public, which has an interest in preserving the environment. The court cannot find that the Charltons incurred special or peculiar damage as a result

17

of these violations. They, like everyone else, suffered the general damage that zoning and land use laws are enacted to prevent.

While the Charltons have complained about the height of Mr. Delekto's house, the "extra" basements under the breezeway and garage, and the placement of the structure as it relates to the high water mark, those allegations stem from permit violations. Title 30-A M.R.S.A. § 4302 does not support the premise that a permit violation gives rise to a nuisance. As Mr. Smith testified, permit violations are to be dealt with by those persons charged with their enforcement: the CEO and the Planning Board.

The remaining issue is the construction of the drainage ditch/retaining wall directly on the common property boundary. The Ordinance requires that all structures be set back twenty-five feet from any lot line. Ordinance § 15(A)(2). The construction of the drainage ditch/retaining wall is a clear violation of that ordinance and, pursuant to 30-A M.R.S.A. § 4302, a nuisance. However, the only parties arguably damaged by the placement of the ditch/retaining wall are the plaintiffs.[4] The ditch/retaining wall is undeniably unsightly, although the plantings required by the DEP may, in time, soften the effect. In any event, aesthetic concerns alone would not give rise to a determination that the Charltons have been damaged. The Charltons have also alleged that the placement of the ditch caused

_____

[4]While the ditch itself may cause water and silt to run into the lake, that must be considered a public nuisance, as the damage caused is to the lake, and not to any individual.

18

water and/or silt to accumulate on their land. If proven, that might support a finding that the placement of the ditch had caused damage that was specific to them.

Mr. Charlton testified that, even before the ditch/retaining wall was constructed, water and silt regularly trickled from Mr. Delekto's property, through the rock wall, and across their land. In fact, during the only conversation Mr. Charlton had with Mr. Delekto, Mr. Charlton suggested installing a silt fence on the Delekto side of the rack wall that then divided their properties. That regular trickle of water ended with the installation of the ditch/retaining wall.

Since the construction of the ditch/retaining wall, some standing water has appeared on the Charlton property on two occasions: once during July 1999; and again during May 2000. Both occasions followed periods of heavy rain, and neither caused any "damage" to the Charlton's property.

In an attempt to demonstrate that the entire Delekto project had diminished the value of their property, the plaintiffs presented testimony from real estate appraiser Jonathan Beal. By his own admission, the method Mr. Beal used to place a dollar figure on the change in value was not a method sanctioned by his peers. For that reason, the court has not relied upon Mr. Beal's testimony concerning any alleged diminution in value. In addition, the Charltons were adamant in their assertions that they intended to maintain this property as a place for future generations to gather. Selling the property has never been part of their plan.

Mr. Beal did not testify about the effect two episodes of water flow might have on the Charlton's property. His opinion was largely based upon his subjective belief

that the size and placement of the Delekto structure cause a negative "visual impact" on the Charltons' camp.

Based upon the evidence presented, the court finds that the Charltons have failed to prove, by a preponderance of the evidence, that they suffered any special damage as a result of the placement of the ditch/retaining wall.

ORDER

1. Judgment for the Town on Count I, the Charltons' M.R. Civ. P. 80B appeal, was granted in Judge Perkins' Order dated November 8, 1999.

2. On Count II, requesting injunctive relief based upon the allegation that Mr. Delekto had caused a nuisance pursuant to 30-A M.R.S.A. § 4302, judgment is granted to the defendant.

3. On Count III, requesting a declaratory judgment against the Planning Board and Mr. Delekto, judgment is granted to the defendants.

4. On Count IV, requesting a declaratory judgment against Mr. Delekto, judgment is granted to the defendant.

5. On Count V, alleging negligence against Mr. Delekto, judgment is granted to the defendant.

6. On Count VI demanding damages from Mr. Delekto for nuisance, pursuant to 30-A M.R.S.A. § 4302 and common law, judgment is granted to the defendant.

This Order is to be incorporated into the docket by reference, in accordance with M.R. Civ. P. 79(a).

DATED: *July 21, 2000*

_____
Ellen A. Gorman
Justice, Maine Superior Court

Date Filed __10-13-98__     OXFORD     Docket No. ___AP 98-10___

County

Action ___APPEAL 80B___

DONALD L. GARBRECHT
LAW LIBRARY

JUL 28 2000

WILLIAM & BARBARA CHARLTON

'RODNEY SMITH and
INHABITANTS OF THE TOWN OF OXFORD and
OXFORD PLANNING BOARD and
CARL DELEKTO

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| ANN R ROBINSON ESQ<br>GREGORY P HANSEL ESQ / LEAD COUNSEL<br>PRETI FLAHERTY BELIVEAU & PACHIOS LLC<br>PO BOX 1058<br>AUGUSTA  ME  04332-1058 | GEOFFREY H HOLE ESQ(R. Smith,Town of Oxf<br>BERNSTEIN SHUR SAWYER & NELSON PA(Plan.B<br>PO BOX 9729<br>PORTLAND  ME  04104-5029 |
| | ELLIOT L EPSTEIN ESQ(Carl Delekto)<br>ISAACSON & RAYMOND<br>PO BOX 891<br>LEWISTON  ME  04243-0891 |

| Date of Entry | |
|---|---|
| 10-13-98 | Complaint Summary Sheet filed. |
| 10-13-98 | Complaint for Declaratory and Injunctive Relief and Complaint Pursuant to Rule 80B(a) filed. |
| 10-13-98 | Filing fee of $120. received. Rec. # 8270. |
| 10-13-98 | Case File Notice and PSS and Jury Demand mailed to A. Robinson Esq. |
| 11-02-98 | Plaintiffs' First Amended Complaint filed. |
| 11-16-98 | Answer of Defendants Rodney Smith, the Inhabitants of the Town of Oxford, and the Oxford Planning Board to the Plaintiffs' First Amended Complaint file |
| 11-23-98 | Answer of Defendant Carl M Delekto filed. |
| 12-02-98 | Defendant Carl M. Delekto's Motion to Dismiss filed. |
| 12-02-98 | Memorandum of Law in Support of Defendant Carl M Delekto's Motion to Dismiss filed. |
| 12-11-98 | Plaintiff's Motion to Extend Time to File Pretrial Scheduling Statement and Notice of Appearance filed. |
| 12-18-98 | Case File Notice and PSS and Jury Demand filed for 2 day non-jury trial. |
| 12-21-98 | Notice and Briefing Schedule for 80B Appeal mailed to G. Hansel,  Esq., The Plaintiff's brief is due 40 days after 11/2/98(12/15/98) which is the date on which the first amended complaint was filed in this Court, filed.Copy of Briefing Schedule mailed to G. Hole Esq. & E. Epstein Esq. |
| 12/21/98 | Plaintiffs' Memorandum of Law in Opposition to Carl Delekto's Motion to Dismi Count Five of the Amended Complaint filed. |